UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| JOHN THOMAS GILBERT, *et al.*, | ) | |
| Plaintiffs, | ) ) ) | Civil No. 3:23-cv-00064-GFVT |
| v. | ) ) ) | **OPINION** |
| FRANKFORT INDEPENDENT SCHOOL DISTRICT, *et al.*, | ) ) ) | **&** **ORDER** |
| Defendants. | ) ) | |

\*\*\*\*   \*\*\*\*   \*\*\*\*   \*\*\*\*

John Gilbert states that his "life" and "high school career" were effectively eviscerated after he was "cancelled" by his high school faculty pursuant to false allegations of racism. In addition to those responsible faculty, he purports to sue the local school board, school district, finance corporation, and individual board members. Because some of those entities are immune or unconnected to the underlying incident, their Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

**I**

Senior year of high school is a joyful time for many.  For John Gilbert[1], it was nothing short of "devestat[ing]."[2]  [R. 1-1 at 150.]  As the schoolyear commenced, Gilbert decided to switch out of his African American History course and into a JAG course.[3]  *Id.* at 149.

He states that his transfer request spawned a "campaign of harras[ment] and . . . verbal abuse" perpetrated by Frankfort High School officials.  *Id.*  Principal Reed and Assistant Principal Foley allegedly lambasted Gilbert as a racist in front of "staff members, teachers, and students[.]"  *Id.*  In Frankfort High School's "main office," Reed "commanded" Gilbert "to explain to Ms. Jointer, the school administrative assistant, who happens to be African American, why [Gilbert] wanted to drop African American History."  *Id.* at 150.  Gilbert advised Jointer that he had already completed his required history credits and his parents supported his decision.  *Id.*  Assistant Principal Foley, apparently overhearing the exchange, "shout[ed]" "[a]re your parents racist?!?"  *Id.*  "Humiliated" by this interrogatory, Gilbert "felt utterly forced" to declare: "[y]es, my parents hate Black people[.]"[4]  *Id.* at 154.

---

[1] Although Gilbert was a minor at the time of the incident, he has since turned 18.  [R. 1-1 at 146.]  Accordingly, the Court will refer to him by his name instead of his initials.  *See* Fed. R. Civ. P. 5.2 (explaining that "an individual known to be a minor" should be referred to by his initials).

[2] To "cancel" means "to withdraw one's support for (someone, such as a celebrity, or something, such as a company) publicly and especially on social media."  *Cancel*, Merriam Webster, https://www.merriam-webster.com/dictionary/cancel#h1 (last visited Aug. 11, 2024).  Accordingly, "cancel culture" "refers to the widespread practice of withdrawing support (or 'canceling') public figures and companies after they have done or said something that is considered objectionable or offensive." *City of Pontiac Police & Fire Ret. Sys. v. Jamison*, No. 3:20-cv-00874, 2022 WL 884618, at *4 n.9 (M.D. Tenn. Mar. 24, 2022); *see also Antony v. Buena Vista Books, Inc.*, No. CV 18-205-DLB-CJS, 2024 WL 218111, at *3 (E.D. Ky. Jan. 19, 2024), *appeal dismissed sub nom. Antony v. Disney Enterprises, Inc.*, No. 24-5140, 2024 WL 2215929 (6th Cir. Mar. 25, 2024) ("Courts routinely take judicial notice of dictionary entries as they 'are not subject to reasonable dispute.'") (internal citation omitted).

[3] The allegations recounted here are taken from the Plaintiffs' Amended Complaint.  [R. 1-1 at 146–57.]  At the Motion to Dismiss stage, the Court presumes their truth while making reasonable inferences in the Plaintiffs' favor.

[4] Although the Amended Complaint does not clarify, the Court presumes Gilbert's statement was intended to be facetious.

In spite of their awareness of the harassment, the School District, the School Board, and various other Defendants allegedly did nothing. *Id.* at 156. By the time of the "main office" incident (and unbeknownst to Gilbert), Reed had approved the transfer request and arranged for Gilbert to switch. *Id.* at 150–51.

But the damage was already done. Feeling like his reputation was in tatters, Gilbert was forced to switch high schools. *Id.* at 152. However, "the damage followed him to his new school," where "he was consistently and repeatedly confronted as a racist by fellow students and local citizens." *Id.* As a result, Gilbert left school altogether. *Id.*

Gilbert's parents weren't immune from the fallout. John's father lost longtime friends and suffered professional damage. *Id.* His mother left her longstanding post as a special education teacher in the Franklin County Schools. *Id.*

Gilbert and his parents bring claims against the Frankfort Independent School District, the Frankfort Independent School District Finance Corporation, the Frankfort Independent School Board, Principal Reed, Assistant Principal Foley, Superintendent Satterly, and several individual members of the School Board. *Id.* at 146–48. The Gilberts appear to sue the individuals in their official and individual capacities. They seek compensatory and punitive damages for defamation, defamation per se, intentional infliction of emotional distress, violations of the First Amendment to the United States Constitution, violations of Section One of the Kentucky Constitution, and violations of Kentucky Revised Statute § 161.164(6). *Id.* at 149–56. *See* Ky. Rev. Stat. Ann. § 161.164(6) ("An employee of a public school district [] shall not violate a student's First Amendment rights by requiring or incentivizing a student to advocate in a civic space on behalf of a perspective with which the student or the parent or guardian of a

minor student does not agree."). Now, the School District, the Finance Corporation, the School Board, and the School Board Members move to dismiss.[5] [R. 1-1 at 68–82.]

## II

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may assert lack of subject-matter jurisdiction as a defense. In so doing, the defendant challenges the Court's power to hear the case before it. When the Court's jurisdiction is challenged in this way, the plaintiff bears the burden of demonstrating that jurisdiction exists. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the plaintiffs' complaint. Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion, a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). However, a court "'need not accept as true legal conclusions or unwarranted factual inferences.'" *Id.* (quoting *Gregory v. Shelby Cnty.*, 220 F.3d 433, 446 (6th Cir. 2000)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, "[t]he factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555).[6]

---

[5] Reed, Foley, and Satterly have filed Answers to the Amended Complaint.
[6] The Defendants filed their Motion to Dismiss prior to removal. Thus, their Motion is brought pursuant to Kentucky's civil procedure rules. In reviewing the Motion, this Court will apply the Federal Rules of Civil

4

**A**

As a threshold matter, Defendants Frankfort Independent School District and Frankfort Independent Finance Corporation state that they are improper parties. [R. 1-1 at 77–78.] The Plaintiffs disagree, instead asserting that each entity bears personal responsibility for the incident. *Id.* at 85–87. The Defendants are correct.

**1**

As for the School District, it is easy to see why. "The Kentucky Supreme Court has definitively held the proper defendant for an action against a Kentucky public school is the governing Board of Education." *Qiu v. Scott Cnty. Sch.*, No. 5:21-CV-00197-GFVT, 2022 WL 1462758, at *2 (E.D. Ky. May 9, 2022) (citing *Nelson Cnty. Bd. of Educ. v. Forte*, 337 S.W.3d 617, 625 (Ky. 2011) (overruled on other grounds)).

Kentucky's statutory scheme provides that a school board is "the administrative and quasi-legislative entity created specifically to run the school district and to sue and be sued[.]" *Forte*, 337 S.W.3d at 625. Consequently, a school district is necessarily "under the management and control of a board of education." Ky. Rev. Stat. Ann. § 160.160; *see also Forte*, 337 S.W.3d at 625 ("Assuming that a school district is even a suable entity, it cannot, under the present statutory scheme act alone."). Given this hierarchy, *Forte* determined that the "the board of education . . . is the proper entity to sue." *Id.*; *see also M.P.T.C. v. Nelson Cnty. Sch. Dist.*, 192 F. Supp. 3d 798, 810 (W.D. Ky. 2016) ("The Nelson County School District is not an entity subject to suit. Instead, the proper entity is the Nelson County Board of Education who has been made a real party in interest by Plaintiff's suit against the Individual Defendants in their official

---

Procedure. *See Felder v. Casey*, 487 U.S. 131, 151 (1988) (federal courts sitting in pendent jurisdiction apply state substantive law and federal procedural law).

capacities." (citing *Forte*, 337 S.W.3d at 625)). Because the Frankfort School Board is the proper party, the Court will dismiss the Frankfort Independent School District as a Defendant in this action.

2

Same result for the Finance Corporation. The Corporation advises that it "has no policy making ability or disciplinary authority," and exists only to raise funds and buy properties. [R. 1-1 at 78.] While the Corporation apparently has the capacity to sue and be sued, *id.* at 85, it is unclear what connection it has to the facts of this case. Without any explanation from the Plaintiffs, the Court will dismiss the claims against the Finance Corporation without prejudice.

Now, the claims against the Finance Corporation and the School District are gone, while the claims against the School Board and the individual Board members remain.

B

But those surviving claims have yet to run the immunity gauntlet. First, the Court addresses the federal and state claims against the School Board.

1<br>a

Both sides agree that the Board is not immune from the federal First Amendment Claim. [R. 1-1 at 78–81.] *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978) ("Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies.") (emphasis in original); *Banks v. Breathitt Cnty. Bd. of Educ.*, 925 F. Supp. 2d 856, 860 (E.D. Ky. 2013) ("As a division of local government, the Board of Education may be sued directly."); *Green v. Nicholas Cnty. Sch. Dist.*, 756 F. Supp. 2d 828, 831 (E.D. Ky. 2010) ("Courts in this district, as recognized by the Sixth Circuit, have long held

that local school districts are not arms of the state and thus, may not assert immunity from suit under the Eleventh Amendment.").[7]

**b**

Does that mean the Board is susceptible to § 1983 liability in this context? Not necessarily. A municipality may be subject to liability for "deprivations of federally protected rights caused by action taken 'pursuant to official municipal policy of some nature[.]'" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 471 (1986) (quoting *Monell*, 436 U.S. at 691). But the municipal liability contemplated by *Monell* is not doled out merely on the basis of respondeat superior. *See Monell*, 436 U.S. at 694 ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."). "Instead, a plaintiff must show that 'through its deliberate conduct, the municipality was the moving force behind the injury alleged.'" *Wright v. City of Euclid*, 962 F.3d 852, 879–80 (6th Cir. 2020) (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)). He does so by establishing "that the municipality had a 'policy or custom' that caused the violation of his rights." *Id.* at 880 (quoting *Monell*, 436 U.S. at 694).

There are four ways to demonstrate an illegal policy or custom. *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019). In particular, a plaintiff may show: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Impermissible

---

[7] Defendants' Motion to Dismiss focuses on sovereign immunity, and as such does not address the substance of the alleged First Amendment violation. Accordingly, the Court will not consider the issue of whether the Plaintiffs, having cleared the immunity hurdle, successfully state a First Amendment claim against the schoolboard.

7

ratification may occur when the municipality "fail[s] to meaningfully investigate and punish allegations of unconstitutional conduct." *Wright*, 962 F.3d at 882.

The Board rejects what it characterizes as an attempt to hold it liable for the unrelated negligence of school staff. [R. 1-1 at 80.] The Gilberts disagree. Their Amended Complaint asserts that "The Frankfort Independent School Board . . . ratified [staff's tortious conduct] by taking no remedial measures after these actions were reported." *Id.* at 156.

At the 12(b)(6) stage, Plaintiffs at least allege a theory of municipal liability. And because the Defendants don't challenge the substantive First Amendment allegation (they only address immunity and vicarious liability), the Court will assume (without deciding) that such a violation occurred. Accordingly, 12(b)(6) dismissal of federal claim against the Board would be inappropriate.

**2**

Next, the Board asserts entitlement to state law immunity while challenging the invocation of vicarious liability. [R. 1-1 at 78–81.] In response, the Gilberts appear to assert that the existence of § 1983 somehow vitiates the prospect of Kentucky governmental immunity in this case. *Id.* at 91.

**a**

First, the Gilberts' response misunderstands the distinction between federal and state immunity. They are correct that state law immunity does not shield the School Board from suit for the First Amendment Claim. *See Jefferson Cnty. Fiscal Ct. v. Peerce*, 132 S.W.3d 824, 836 (Ky. 2004), *as modified* (Feb. 23, 2004) ("[I]t is clear that '[c]onduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law.'" (quoting *Martinez v. California*, 444 U.S. 277, 284 n.8 (1980))). But the claims for

defamation, defamation per se, intentional infliction of emotional distress, and violations of the Kentucky Constitution and Kentucky Revised Statute §161.164(6) are governed by *Kentucky* law.  *See Felder*, 487 U.S. at 151 (federal courts sitting in pendent jurisdiction apply state substantive law and federal procedural law); *see also id.* ("[F]ederal courts are constitutionally obligated to apply state law to state claims[.]"); *Smith v. Floyd Cnty. Bd. of Educ.*, 401 F. Supp. 2d 789, 801 (E.D. Ky. 2005) ("[S]tate law governs the applicability of immunity to state law claims.") (internal citation omitted).

In Kentucky, Schoolboards enjoy immunity from suit for governmental functions:

> A board of education is an agency of state government and is cloaked with governmental immunity; thus, it can only be sued in a judicial court for damages caused by its tortious performance of a proprietary function, but not its tortious performance of a governmental function, unless the General Assembly has waived its immunity by statute.
>
> *Grayson Cnty. Bd. of Educ. v. Casey*, 157 S.W.3d 201, 202–03 (Ky. 2005), *as modified*

(Mar. 8, 2005); *see also Yanero v. Davis*, 65 S.W.3d 510, 519 (Ky. 2001).  "A governmental function is one that is integral to state government whereas a proprietary function is one that is engaged in for profit."  *Faulkner v. Greenwald*, 358 S.W.3d 1, 3 (Ky. Ct. App. 2011); *see also Breathitt Cnty. Bd. of Educ. v. Prater*, 292 S.W.3d 883, 887 (Ky. 2009) ("[A]ctivities in direct furtherance of education will be deemed governmental rather than proprietary."); *Thorpe ex rel. D.T. v. Breathitt Cnty. Bd. of Educ.*, 932 F. Supp. 2d 799, 802–03 (E.D. Ky. 2013) ("Proprietary functions include 'corporate acts' or acts occurring when a government agency 'is engaged in a business of a sort theretofore engaged in by private persons or corporations for profit.'" (quoting *Yanero*, 65 S.W.3d at 520)).

Against this backdrop, the Court must initially distinguish between the statutory claim and the remaining state claims.

**i**

First, the Court turns to the statutory claim. Kentucky Revised Statute § 161.164 appears to constitute a waiver of the Board's immunity by the General Assembly. Here's why: the former Kentucky Revised Statute § 162.162 was initially enacted "to prevent [] political reprisal" by superintendents and school board members. *Calhoun v. Cassady*, 534 S.W.2d 806, 808 (Ky. 1976); *Harlan Cnty. Bd. of Ed. v. Stagnolia*, 555 S.W.2d 828, 830 (Ky. Ct. App. 1977). And although § 162.162 was repealed in 1990, § 161.164 contains analogous language. *See Banks v. Breathitt Cnty. Bd. of Educ.*, 925 F. Supp. 2d 856, 862 n.1 (E.D. Ky. 2013); *Napier v. Breathitt Cnty. Bd. of Educ.*, 31 F. Supp. 3d 901, 908 (E.D. Ky. 2014) ("Kentucky courts have construed [§ 161.164] as being 'enacted to prevent superintendents and boards of education from perpetuating transfers and demotions as a political vendetta or reprisal for a school board employee's political views or affiliations.'" (quoting *Calhoun*, 534 S.W.2d at 808)).

Consistent with this history and purpose, another district court in the Eastern District has previously held that "KRS 161.164 is a limited waiver of the Commonwealth, and its political subdivisions', immunity." *Id.* Consequently, it determined, "the Board of Education is not entitled to immunity from [] claims based on KRS 161.164." *Id.* This Court agrees, and therefore holds that the Board is not entitled to immunity from Plaintiffs' statutory claim.

**ii**

As for the remaining state claims, the waters become muddier. The Board asserts, without explanation, that its conduct was not proprietary. [R. 1-1 at 78–81.] The Gilberts resist this characterization, citing "requirements that certain classes and curriculum be taught so that the Frankfort Independent School District would be eligible for and receive certain grant funding[.]" *Id.* at 91–92. That funding, according to the Plaintiffs, "was placed in jeopardy by []

10

Gilbert potentially leaving a class which needed a particular number of students in it for the class to be taught." *Id.* at 92. Accordingly, the Gilberts suggest that the alleged harassment campaign was deployed for the purpose of achieving or maintaining certain grant funding. *Id.* The Board does not reply to this assertion.

Faced with a paucity of discovery and argumentation on this issue, the Court cannot say as a matter of law that governmental immunity applies to shield the Board from the state tort and Constitutional claims. *Cf. Meinhart v. Louisville Metro Gov't*, 627 S.W.3d 824, 829–30 (Ky. 2021) (explaining that "trial courts must make certain factual findings when deciding a party's entitlement to qualified official immunity, and a modicum of discovery may be necessary before the court can reasonably make the determination").

b

But before those claims may proceed, the Court must determine whether they are properly asserted against the Board. Any potential School Board liability for the state tort claims must be vicarious (as opposed to direct) because the Board did not participate in the alleged harassment.

The Board correctly points out that under Kentucky law, "there is no vicarious liability on the part of a public official for acts of subordinates in which the official was not directly involved." *Franklin Cnty. v. Malone*, 957 S.W.2d 195, 199 (Ky. 1997), *overruled on other grounds by Commonwealth v. Harris*, 59 S.W.3d 896 (Ky. 2001) *and Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2001); *Smith v. Franklin Cnty.*, 227 F. Supp. 2d 667, 680 (E.D. Ky. 2002) ("[P]ublic officers in Kentucky are not responsible for the negligence of those employed by them if they have employed persons of suitable skill."); *Williams v. Ky. Dep't of Educ.*, 113 S.W.3d 145, 154 (Ky. 2003), *as modified* (Sept. 23, 2003) ("The 'no vicarious liability' principle

11

recognizes that an otherwise immune entity does not lose that status merely because its agents or servants can be held liable for the negligent performance of their ministerial duties.").[8] Direct involvement means that the official "bear[s] [] personal responsibility." *Bd. of Trs. of Univ. of Ky. v. Hayse*, 782 S.W.2d 609, 615 (Ky. 1989), *overruled on other grounds by Yanero*, 65 S.W.3d at 510. The prototypical example of a personally responsible supervisor is one who knowingly hires an incompetent subordinate. *Osborne v. Aull*, No. 2010-CA-001073-MR, 2012 WL 3538276, at *6 (Ky. Ct. App. Aug. 17, 2012); *Yanero*, 65 S.W.3d at 528. Moreover, the contours of the rule suggest that a supervisor can be liable for an incompetently hired subordinate's tort even if the supervisor did not personally participate in the tortious conduct.

Straining against the outer boundaries of vicarious liability principles, Plaintiffs urge liability for the Board "via the legal theory of respondeat superior[.]" [R. 1-1 at 154.] The Court is not persuaded.

i

Start with Reed and Foley's conduct. First, the Board didn't hire Reed or Foley. *See Yanero*, 65 S.W.3d at 527–28 ("Under the Kentucky Education Reform Act, the local board of education is no longer directly involved in hiring school personnel. The school principal, after consultation with the school council, hires school personnel from a list of applicants submitted by the superintendent.") (citing Ky. Rev. Stat. Ann. § 160.345(2)(h)); *see also* § 160.345(2)(h) (principal appointed by superintendent following consultation with school council). Second, there is no allegation that the Board trained or supervised them. [*See* R. 1-1 at 80 (pointing out that "the hiring, training, and supervision of employees is not a power regulated to the Board").]

---

[8] The Court cannot find any authority indicating that the result would be different when a subordinate commits an intentional tort. *Cf. Patterson v. Blair*, 172 S.W.3d 361, 366–70 (Ky. 2005) (explaining that an employer can be vicariously liable for intentional torts committed by its employees). And neither side provides any arguments on this point.

12

Accordingly, settled Kentucky precedent forecloses any possibility of vicarious Board liability for the behavior of Reed and Foley. *See Yanero*, 65 S.W.3d at 527–28 (vicarious liability inappropriate when school board did not hire negligent employees).

### ii

What about Superintendent Satterly? Unlike other school faculty, the Board is statutorily responsible for appointing the Superintendent. *See* Ky. Rev. Stat. Ann. § 160.290(1). The Gilberts' Amended Complaint alleges that the Defendants took "no remedial measures after [the harassment was] reported." [R. 1-1 at 156.] They further complain that the Board "should have anticipated th[e] conduct in question." *Id.* Taking these allegations in the light most favorable to the Gilberts, there is a reasonable inference that the board negligently appointed the Superintendent. The "should have anticipated" statement suggests the Board had reason to believe that Reed, Foley, or the Superintendent were likely to behave negligently. One way the Board could possess such knowledge is if the Board knowingly appointed an unfit Superintendent. On these allegations, the Gilberts in theory manage to state a claim.

But they still have a glaring problem: Superintendent Satterly didn't participate in the intentional torts. It appears the Gilberts wish to hold the Board liable for defamation and intentional infliction on the grounds that the Superintendent failed to act after her subordinates committed these intentional torts. However, the Plaintiffs provide no Kentucky authority to suggest that a government entity incurs vicarious intentional tort liability when its employee (who does not commit the intentional tort) fails to respond adequately after the tort is committed. Indeed, such a holding would appear to violate Kentucky's longstanding "direct involve[ment]" predicate for the imposition of vicarious liability in the context of public employment. *See Malone*, 957 S.W.2d at 199. Accordingly, the Court will dismiss the intentional tort and state Constitutional claims against the Board.

**c**

Does the statutory claim meet the same fate?  Next, the Court must determine whether the aforementioned waiver of immunity functions to expose the Board to vicarious liability under § 161.164(6).  That narrow question appears to be an issue of first impression as it pertains to this statute.  *See Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) ("If the state's highest court has not addressed the issue, the federal court must attempt to ascertain how that court would rule if it were faced with the issue."); *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013) ("In resolving issues of [state] law, we look to the final decisions of that state's highest court, and if there is no decision directly on point, then we must make an *Erie* guess to determine how that court, if presented with the issue, would resolve it.").

The Gilberts purport to sue the Board under § 161.164(6), which provides as follows:

> [a]n employee of a public school district or public charter school shall not violate a student's First Amendment rights by requiring or incentivizing a student to advocate in a civic space on behalf of a perspective with which the student or the parent or guardian of a minor student does not agree.

Based on the text and purpose of the statute, the Court finds that it does waive School Board immunity for the negligence of school employees.  If no such waiver existed, the statute would have minimal teeth.  Public school teachers who violate § 161.164(6) are already protected by qualified immunity.  *Yanero*, 65 S.W.3d at 522.  Without a vicarious liability immunity waiver, a student would be unable to recover if her rights were violated by a teacher negligently performing a discretionary duty.  Why would the General Assembly go to the trouble of passing an oft-unenforceable statute?[9]  Accordingly, it stands to reason that the General

---

[9] Indeed, it appears the General Assembly took great efforts to enact the provision.  In January 2022, Kentucky SB 1 was introduced in the Senate.  *See Kentucky Senate Bill 1*, LegiScan, https://legiscan.com/KY/bill/SB1/2022 (last visited Aug. 12, 2024).  Among other things, the proposed legislation sought to amend § 161.164 to include three

Assembly intended to waive the Board's immunity in such cases. Otherwise, there would be plenty of instances in which students aggrieved by a statutory violation would be unable to sue. On this basis, the Court will allow the statutory claim against the Board to proceed.

### C

Finally, the Court turns to the claims against the individual School Board members. As an initial matter, the Court will dismiss the official capacity claims against the members because they are duplicative of the claims against the Board, itself. *See Banks*, 925 F. Supp. 2d at 860 (dismissing official capacity school board member defendants because "any judgment against the individual defendants in their official capacities will, in reality, be a judgment against the Board of Education and will only be collectible against the Board of Education"). Now, the claims against the Board Members remain only in those members' individual capacities. And because Defendants' Motion does not appear to address the individual capacity claims against the members, the Court will permit those claims to proceed.

### III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The Defendants' Motion to Dismiss is **GRANTED IN PART and DENIED IN PART**;

2. The Frankfort Independent School District is **DISMISSED** as a Defendant in this action;

---

new provisions (subsections (5)-(7)). § 161.164(5) provides a requirement that public school instruction on controversial topics be both age appropriate and non-discriminatory. § 161.164(7) prohibits requiring school employees to partake in trainings that "coerce[] the employee to stereotype any group." Governor Beshear vetoed SB 1 on April 6, 2022. *See* Jennifer Henderson & Amanda Musa, *Kentucky Governor Vetoes Bill Incorporating 'Anti-Critical Race Theory,' Calling it a Step Backward*, CNN (Apr. 7, 2022, 8:35 PM), https://www.cnn.com/2022/04/07/us/kentucky-governor-vetoes-bill-anti-critical-race-theory/index.html. The General Assembly subsequently overrode the veto, and SB 1 became law on April 13, 2022. It appears that SB 1 was prompted by controversy over curriculum requirements, particularly as it relates to DEI trainings and classroom instruction on gender, sexuality, and 'critical race theory.'

3. The claims against the Frankfort Independent Finance Corporation are **DISMISSED** without prejudice;

4. The defamation, defamation per se, intentional infliction of emotional distress, and Kentucky Constitutional claims against the Frankfort Independent School Board are **DISMISSED**; and

5. The claims against the School Board member Defendants in their official capacities are **DISMISSED**.

This the 22nd day of August, 2024.

Gregory F. Van Tatenhove
United States District Judge